IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

EDWARD G. WATSON,              )
                                )
    Plaintiff,            )
                                )
       v.               )       1:05cv1173 (JCC)
                                )
CARLOS M. GUTIERREZ,     )
Secretary of Commerce,    )
                                )
    Defendant.         )

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on Defendant's motion for summary judgment.  For the reasons stated below, the Court will grant Defendant's motion.

## I. Background

Plaintiff Edward G. Watson, an African American, was employed by the United States Patent and Trademark Office ("USPTO") as a trademark examiner starting on June 5, 2000. Plaintiff's employment commenced with a twelve-week training program.  Following training, Plaintiff was assigned to permanent placement in one of fifteen law offices and was assigned a mentor, Susan Lawrence, who was later replaced by Odette Bonnet.

An important aspect of Plaintiff's job involved the timely examination of applications for a trademark; the rate at which this examination process is done is termed "production." During Plaintiff's 120-day evaluation in October of 2000, he was

classified in the "fully successful" rate of production.  By December 30, 2000, Plaintiff's production dipped into the "unsatisfactory" range, after which Plaintiff was confronted with concerns about his timeliness in handling cases.  In January of 2001, Bonnet organized Plaintiff's office and placed sheets of paper around stacks of files allegedly as an "organizational aid."  Plaintiff found this act to be humiliating.  Later in that month, Plaintiff learned that others in his office assumed he had training on how to handle amended actions ("amendeds"), on which he allegedly did not receive training.  Following this realization, Bonnet created a handout for Plaintiff about the subject of "amendeds."

In late January of 2001, Plaintiff's production rate again dipped below the "fully successful" level and he became ineligible to work overtime or to participate in the increased flexitime program.  Following a mid-year review in April of 2001, Meryl Hershkowitz, the managing attorney in Plaintiff's office, informed Plaintiff that she was considering recommending his termination.  Plaintiff and Hershkowitz exchanged communication regarding explanations for Plaintiff's overall performance.  On May 1, 2001, Plaintiff drafted a document listing options for how he wished to go forward at USPTO.  On May 7, 2001, Hershokwitz informed Plaintiff that she planned to recommend his termination; she did so by letter on the following day to the Employee

Relations Division.  Plaintiff contacted the Office of Civil

Rights at USPTO ("OCR") on May 11, 2001.  He tendered a notice of

resignation on May 16, 2001, which became effective that day.

Plaintiff filed a complaint with the OCR on September

3, 2001.  He filed this complaint on August 26, 2004 in the

District Court for the District of Columbia against the

Department of Commerce alleging a hostile work environment,

disparate treatment, constructive discharge, and retaliation

under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.*  On October 11, 2005, the case was transferred to

this Court.  On February 1, 2006, this Court entered an agreed

order dismissing counts six, seven, eight, and nine with

prejudice.  On April 28, 2006, Defendant filed a motion for

summary judgment for the remaining counts.  This Motion is

currently before the Court.

## II. Standard of Review

Summary judgment is appropriate only if the record

shows that "there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of

law."  *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs.

Applications & Serv., Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996)

(citations omitted).  The party seeking summary judgment has the

initial burden to show the absence of a material fact.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The party opposing summary judgment may not rest upon mere allegations or denials.  A "mere scintilla" of evidence is insufficient to overcome summary judgment.  *Anderson*, 477 U.S. at 248-52.

A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party.  *See id.* at 255.   Unsupported speculation is not enough to withstand a motion for summary judgment.  *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.   In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier

of fact to find for the non-movant."  *Brock v. Entre Computer Ctrs.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

### III. Analysis

A.  Disparate Treatment

To establish a *prima facie* case of disparate treatment, Plaintiff must demonstrate that: (1) he was a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action by his employer; and (4) similarly situated employees outside of his protected class received more favorable treatment.  *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 n.6 (1981).  Once the plaintiff sets forth a *prima facie* case, the burden of production shifts to the employer "to articulate some legitimate, non-discriminatory reason for the employee's rejection."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Of course, the ultimate burden of persuasion rests with the plaintiff, who must then prove that the reason proffered by the employer was not the true reason for the adverse employment action.  *See Texas Dep't of Cmty. Affairs*, 450 U.S. at 256.  The plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Texas Dep't of Cmty. Affairs*, 450 U.S. at 256 (citing *McDonnell Douglas*, 411 U.S. at

804-05).  However, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."  *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 286 (4th Cir. 2004) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)).

An adverse employment action is a discriminatory act which "adversely affects the terms, conditions, or benefits of the plaintiff's employment."  *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal quotations omitted).  In other words, a "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998).

Plaintiff grounds his disparate treatment claim in a number of events, including the requirement of seeking approval prior to calling applicants or transferring files, the inadequate training he received on "amendeds," the fact that he was evaluated on a numerical percentage score while others were not, the instruction not to pull new cases when he had a backlog of amended cases, the denial of overtime and flexitime eligibility, and the fact that he was generally held to a higher standard than

the PAP.  All of these allegations, however, fail to amount to a
*prima facie* case of disparate treatment.

Most of Plaintiff's allegations lack the *prima facie*
requirement of showing an adverse employment action.  The
requirement that Plaintiff seek approval prior to calling
applicants or transferring files does not rise to the level of a
significant change in employment status, especially when this is
routine policy.  Similar logic applies to the instruction not to
pull new cases and failure to grant signatory authority.  If
Plaintiff was not complying with the requirement that all amended
actions be completed within twenty-one days, such an instruction
was allowed and such authority could be properly withheld.
Similarly, being evaluated through a numerical percentage system
rather than any other system, if the evaluation reaches similar
conclusions, does not have any effect on employment, much less
classify as an adverse employment action.  As a result, none of
these complaints are actionable.

Plaintiff alleges that he was the subject of inadequate
training, which amounts to a disparate treatment claim.  A lack
of training claim gives rise to a separate four-part test.  In
*Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645 (4th Cir.
2002), "[t]o establish a *prima facie* case of discriminatory
denial of training, a plaintiff must show that: (1) the plaintiff
is a member of a protected class; (2) the defendant provided

training to its employees; (3) the plaintiff was eligible for the training; and (4) the plaintiff was not provided training under circumstances giving rise to an inference of discrimination." *Id.* at 650.  Plaintiff argues that he was denied training in processing "amendeds" and in processing and receiving retroactive points.

Plaintiff participated in the full twelve-week training program that every employee in his similar situation participated in upon his or her arrival at USPTO.  When he was assigned to his permanent position, Plaintiff was given a comprehensive job-related manual and assigned a mentor, as is routine.  Plaintiff acknowledges that once he verbalized concern about his knowledge of "amendeds," Bonnet promptly drafted a document concerning the subject and gave him personalized training.  No similar action occurred when Plaintiff informed his supervisors that he wanted his retroactive points calculated, however.

None of these facts, or any others purported by Plaintiff, suggest an inference that Plaintiff suffered discrimination.  In regard to the amendeds complaint, this conclusion is further bolstered by the fact that he was given immediate one-on-one training when the issue arose, thus making it completely implausible to infer discrimination.  As for the claim regarding retroactive points, there is serious doubt about whether any formal training on the subject occurred, and even if

it did, there is no material issue in dispute that would allow an

inference of discrimination stemming from the denial of such

training to Plaintiff.

Finally, Plaintiff also alleges that he was denied

overtime and flexitime benefits when he did not maintain a fully

successful rate of production.  The Government concedes that this

action may classify as an adverse employment action, yet it

contends there is no *prima facie* case of disparate treatment

because Plaintiff was failing to meet the legitimate expectations

of his employer.  The Court agrees.  The second element of a

disparate treatment claim requires a showing that Plaintiff's job

performance was satisfactory.  Given the fact that the nature of

Plaintiff's work allows a numerical evaluation system, it is

quite simple to determine his level of job performance.  At the

time that his overtime and flexitime benefits were withheld from

him, Plaintiff was performing well below the fully successful

rate of production.  Given this clear evaluation system, of which

Plaintiff was fully aware, it is indisputable that Plaintiff

fails to meet the second element of the *prima facie* case of

disparate treatment in that he cannot show that his job

performance was satisfactory.

B.  Hostile Work Environment

Title VII provides that it shall be an unlawful

employment practice for an employer to discriminate against any

individual with respect to compensation, terms, conditions, or

privileges of employment because of such person's race.  *See* 42

U.S.C. § 2000e-2(a)(1).  An employee's work environment is a

term, condition, or privilege of employment.  *Smith v. First*

*Union Nat'l Bank*, 202 F.3d 234, 241 (4th Cir. 2000).  To

demonstrate a racially-hostile work environment prohibited by

Title VII, Plaintiff must demonstrate that she was the subject of

conduct that was: (1) unwelcome; (2) based on race; (3)

sufficiently severe or pervasive to alter the conditions of

employment and create an abusive atmosphere; and that (4) there

is some basis for imposing liability on the employer.  *Spriggs v.*

*Diamond Auto Glass*, 242 F.3d 179, 183-84 (4th Cir. 2001).

Plaintiff claims that various remarks concerning his work

performance, an unsolicited re-organization of his office by

Bonnet, a refusal to calculate his retroactive points, and

general hostility directed at him amounted to an actionable

hostile work environment claim.

        Dismissal of a hostile work environment claim is

appropriate where the plaintiff fails to allege the type of

severe or pervasive gender, race, or age-based activity necessary

to state a claim.  *See Bass v. E.I. Dupont de Nemours & Co.*, 324

F.3d 761, 765 (4th Cir. 2003).  A review of the Fourth Circuit's

decisions on the subject reveals that the type of conduct

necessary to state a hostile work environment claim involves

racially offensive remarks or other overt racially insulting

conduct.   In *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180

(4th Cir. 2004), for example, the Fourth Circuit held that no

hostile work environment existed where the plaintiff contended

that his supervisor sought to undermine the careers of African-

Americans and to prevent the plaintiff's efforts to recruit other

African-Americans.   *Id.* at 190-91.   The court emphasized the

plaintiff's concession that "no one in the Booz-Allen workplace

used racial epithets, racially derogatory terms, or demeaning

racial characteristics, or stereotypes with respect to [the

plaintiff] or any other persons, in [the plaintiff's] presence."

*Id.* at 191.   Thus, the *sine qua non* of a hostile work environment

claim is the presence, in the workplace, of racially offensive

remarks or other actions that are, in and of themselves, racially

insulting.   *See, e.g., Harris v. Forklift Sys.*, 510 U.S. 17, 21

(1993) ("When the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe

or pervasive to alter the conditions of the victim's employment

and create an abusive working environment, Title VII is

violated.") (citation and internal quotation marks omitted).

Each of Plaintiff's allegations involve actions that

facially bear no relation to Plaintiff's race.   Lawrence's

comment that Plaintiff should stop using her "as a crutch,"

Bonnet's question to Plaintiff asking why he came to the USPTO,

and Taylor's suggestion that other interviewers did not want to
hire Plaintiff bear no racial undertones.  Furthermore,
Lawrence's use of exclamation marks as a form of "yelling with
the written word" is similarly race-neutral.  Likewise, the act
of returning work for additional correction and failure to
calculate retroactive points without any accompanying racial
language, or even insinuations, does not amount to a hostile work
environment claim.  Finally, Bonnet's act of organizing
Plaintiff's office without permission, although potentially
humiliating, is not at all cognizable as racially insulting.
Most importantly, however, like in *Honor*, Plaintiff concedes that
he was never subjected to derogatory comments based on his race
by his mentors or supervisors during his employment at USPTO.
(Def.'s Mot. Ex. 4, 231-32.)  Thus, while "[e]ven if a jury
believed that [the plaintiff's] complaints evince some hostility
towards his recruiting agenda and/or him personally, there is
nothing in his . . . record to support the notion that this
hostility was generated on account of [the plaintiff's] race."
*Honor*, 383 F.3d at 191.

Even assuming *arguendo* that these complaints were based
on race, Title VII "prohibits only harassing behavior that is so
severe or pervasive as to render the workplace objectively
hostile or abusive."  *Hartsell v. Duplex Products, Inc.*, 123 F.3d
766, 773 (4th Cir. 1997).  There is no evidence for Plaintiff to

satisfy this requirement either.  Thus, Plaintiff's claim for

hostile work environment fails on the most basic element that all

of his allegations are race neutral, and additionally that none

were so severe or pervasive as to render the workplace

objectively hostile or abusive.

C.  Retaliation

        To state a *prima facie* case for retaliation, the

plaintiff must show that: 1) he engaged in a protected activity;

2) the employer took an adverse action against him; and 3) a

causal connection existed between the protected activity and the

claimed adverse action.  *Von Gunten v. Maryland*, 243 F.3d 858,

863 (4th Cir. 2001).  To meet the third requirement, the

plaintiff must show that the adverse action would not have

occurred "but for" the protected conduct.  *Ross v. Communications*

*Satellite Corp.*, 759 F.2d 355, 365-66 (4th Cir. 1985) *overruled*

*on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228

(1989).

        Plaintiff's allegations do not amount to a claim for

retaliation.  Plaintiff satisfies the first element because

complaining to supervisors about perceived discrimination

certainly classifies as engaging in protected activity.  However,

as discussed above, Plaintiff has not shown that an adverse

employment action was taken against him.  Without restating the

discussion, Plaintiff resigned from his employment prior to any

-13-

notice of termination.  Thus, his resignation cannot be used in

the analysis as his adverse employment action.  Nor does the

recommendation of termination classify as an adverse employment

action.  *See Krane v. Capital One Services, Inc.*, 314 F. Supp. 2d

589, 611 (E.D. Va. 2004) (acknowledging that the "Fourth Circuit

has never decided whether an inchoate "threat" such as the one

alleged in this case constitutes an adverse employment action

under the retaliation provision of the ADEA" but listing numerous

cases with persuasive logic from other jurisdiction that hold as

much).  Similarly, none of the administrative or procedural

actions that Plaintiff alleges amount to an adverse action, when

considered individually or collectively.  Thus, Plaintiff's claim

for retaliation is meritless and will be dismissed.

D. Constructive Discharge

          In making a successful constructive discharge claim, "a

plaintiff must at the outset show that his employer 'deliberately

made [his] working conditions intolerable in an effort to induce

[him] to quit.'"  *Heiko v. Colombo Sav. Bank*, 434 F.3d 249, 262

(4th Cir. 2006) (quoting *Matvia v. Bald Head Island Mgmt., Inc.*,

259 F.3d 261, 272 (4th Cir. 2001)).  Thus, there are two elements

Plaintiff must satisfy: "(1) the deliberateness of [an

employer's] actions, motivated by racial bias, and (2) the

objective intolerability of the working conditions."  *Honor*, 383

F.3d at 187.  What constitutes an intolerable working condition

-14-

is determined by the objective perspective of a reasonable person.  *See Heiko*, 434 F.3d at 262.  Yet "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."  *Id.* (quoting *James*, 368 F.3d at 378).

        Plaintiff cannot reach this standard, and therefore the motion for summary judgment will be granted as to this claim as well.  First, Plaintiff indirectly conceded that his working conditions were tolerable.  In fact, in a document that he created in early May of 2001, after many of the events cited by Plaintiff occurred, Plaintiff suggested options for continuing employment in the same office that is now being construed as intolerable.  Secondly, Plaintiff cannot satisfy the element that requires a showing of deliberate actions motivated by racial bias on behalf of his employer to encourage him to quit.  Bonnet's organization of Plaintiff's office comes closest to classifying as a deliberate action, yet even that occurrence was not repeated and was directed at his work performance; it had nothing to do with Plaintiff's race.

        The doctrine of constructive discharge protects Plaintiff "from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers.  He is

-15-

not, however, guaranteed a working environment free of stress."
*Goldsmith v. Mayor and City Council of Baltimore*, 987 F.2d 1064,
1072 (4th Cir. 1993).  There are no material issues in dispute
that suggest that Plaintiff can prove any conditions that are
unreasonably harsh rather than merely stressful.  Furthermore,
the stressful conditions here are related to Plaintiff's work
performance do not stem from racial bias.  Thus Plaintiff has
failed to produce facts to allow this claim to survive the
summary judgment stage.

## IV. Conclusion

For the reasons stated above, the Court will grant
Defendant's motion for summary judgment.


June __6_, 2006                    _____/s/_____
Alexandria, Virginia                      James C. Cacheris
                                   UNITED STATES DISTRICT COURT JUDGE


_____